IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

T.G. and B.G., individually, and on behalf of C.G., a minor,

CASE NO:

Plaintiffs,

v.

SCHOOL BOARD OF HILLSBOROUGH COUNTY, FLORIDA,

Defendant.
_______________________________________/

## COMPLAINT

COMES NOW, the Plaintiffs, by and through the undersigned counsel, and hereby files this Request for an Emergency Injunction and in support thereof states as follows:

## PARTIES

1. The plaintiff, T.G., is an individual, sui juris, who resides in Hillsborough County, Florida. T.G. is C.G.'s mother. T.G. is also an Advanced Practice Registered Nurse (ARPN) and a Certified Pediatric Nurse Practitioner - Primary Care (CPNP-PC).
2. The plaintiff, B.G., is an individual, sui juris, who resides in Hillsborough County, Florida. B.G. is C.G.'s father.

3. The plaintiff, C.G., is disabled child who resides in Hillsborough County, Florida and resides within the boundaries Hillsborough County Public School system. C.G. is currently five (5) years old and just began kindergarten for the 2026-2027 school year. C.G. attended Grady Elementary and is seeking to return to Grady Elementary with the proper supports in place for her to return safely.
4. The defendant, the School Board of Hillsborough County ("Board" or "District") is a corporate body and governmental agency duly empowered by the constitution and statutes of the state of Florida to administer, manage, and operate all Hillsborough County Public Schools. The Board receives state and federal funding for the education of children with disabilities.
5. The Board meets the definition of a public entity under 42 U.S.C. section 12131.

## JURISDICTION AND VENUE

6. Jurisdiction for this action vests pursuant to 42 U.S.C. § 12132 for claims brought under the Americans with Disabilities Act of 1990; 29 U.S.C. § 794; for violations of T.G., B.G. and C.G.'s civil rights. This Court's jurisdiction is based upon 28 U.S.C. § 1331.
7. Venue for this action lies pursuant to 28 U.S.C. section 1391(b) in that the Defendant resides in the judicial district and the cause of action accrued in the

judicial district.

## NATURE OF CASE

8. This is an action commenced under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("section 504"), and Title II of the Americans with Disabilities Act, ("ADA"), 42 U.S.C. § 12132 and their implementing federal and state regulations.

9. In this action, Plaintiffs suffered damages and now seeks declaratory and injunctive relief as well as damages.

## GENERAL ALLEGATIONS

10. C.G. is a 5 year old child diagnosed with Type 1 diabetes Mellitus on November 17, 2025.

11. Diabetes is a metabolic disorder that occurs when your blood sugar (glucose) is too high. The body is unable to use glucose normally because the pancreas produces little or no insulin at all, causing high blood sugar.

12. Diabetes is controlled by administration of insulin, and for C.G. a careful balanced diet.

13. C.G.'s diabetes is unpredictable due to what is called the "honeymoon" stage. Her pancreas can sometimes secrete insulin, and other times does not secrete insulin needed to stabilize her blood sugar. This means that she will sometimes have too much glucose requiring the use of insulin to bring her

glucose down and sometimes she will be too low requiring food or some other fast acting carbohydrate to stabilize or increase her glucose level.

14. Ideally, C.G. should maintain a glucose level of between 80-180.

15. Hyperglycemia is defined as high blood glucose. Symptoms of hyperglycemia include extreme thirst, frequent bathroom usage, increased hunger, drowsiness, dry skin. But C.G. does not show any signs or symptoms of hyperglycemia. Having high sugar is not necessary life threating but the doctor ordered that should her sugars be high, C.G. must avoid heat, sit out of recess/P.E., and be given a no carb snack (like juice) and then monitor her until the sugars return to within normal levels.

16. Hypoglycemia is defined as low blood glucose. Symptoms of hypoglycemia include sweating, dizziness, shaky, anxiousness, blurry vision, fatigue, headache, irritability, and a too fast heartbeat. C.G. does not exhibit sign/symptoms of hyperglycemia so she must be closely monitored because having low blood sugar is life threatening. Low blood glucose levels (hypoglycemia) can cause loss of consciousness, seizures and respiratory/cardiac arrest.

17. C.G. has several challenges related to the management of her diabetes. First, she does not exhibit any signs or symptoms of high (hyperglycemia) or low (hypoglycemia) glucose. Thus, close and constant monitoring is required.

Monitoring requires a finger prick of blood which is then checked for glucose levels. Second, she is only five and cannot accurately check or report her glucose levels so needs close supervision and support to check her levels. She also cannot administer her own insulin if needed or determine her carbohydrate count or accurately determine what amounts of insulin or carbohydrate she requires to get back to level. Third, she is highly allergic to adhesives which has, thus far, made it impossible to have an insulin pump or electronic monitor attached to her body which would assist in evaluating her levels and administering insulin when needed. C.G. wore and trialed multiple types of glucose monitors, and omnipod pump. She spent five months itchy and covered with skin rashes and irritations before it was decided that these devices were not an option for this young child. Thus, monitoring and administration of insulin or carbohydrates are required in the old fashion way with finger pricks and math calculations. C.G. is not old enough to manage this without adult supervision and support.

18. Due to her age, being in this honeymoon stage, and her adhesive allergy, C.G. must have continuous 24/7 diabetes manual intervention, or her diabetes will be uncontrolled.

19. Because it is unpredictable, there must be consistent and close monitoring.

20. The treating physician, Juna Sanchez, M.D., ordered that C.G.'s blood sugar

be checked every hour while at school. He also ordered one to one support through the school day to ensure close monitoring and intervention, if necessary, to ensure C.G. could attend school safely.

21. Dr. Sanchez specifically stated that Type 1 Diabetes Mellitus “requires intensive diabetes management during the school day. [C.G.] has failed recommended insulin pump therapy combined with continuous glucose monitoring due to severe adhesive allergy, chronic pruritus, and secondary skin infections.” He further states that, “Due to [C.G.]’s age, developmental level, and medical condition, she is unable to consistently recognize, communicate, or explain symptoms of hypoglycemia or hyperglycemia. This places her at increased risk for severe blood glucose excursions that may occur rapidly and without reliable warning. Additionally, [C.G.] remains in the honeymoon phase of Type 1 Diabetes Mellitus. During this period, endogenous insulin production is variable and unpredictable, resulting in rapid fluctuations in blood glucose levels and insulin requirements. Her insulin needs can vary daily. The need for frequent glucose meter checks is medically required for her safety. This variability increases the risk of unexpected hypoglycemia and hyperglycemia despite appropriate diabetes management. Because of these medical circumstances, it is medically recommended that [C.G.] requires: • **Continuous one-on-one supervision by**

**a trained adult(s) who remains within five (5) feet of the student throughout the entire school day**…" (emphasis in the original).

22. There has never been a request or an order for a nurse to be with the student at all times. The request and order have always been for supervision by a trained staff member.

23. Dr. Sanchez specifically stated, "Alongside the designated adult is assigned, a back up trained personnel must be present to fulfill Chloe's diabetes care. • The supervising individual must be trained to recognize and respond immediately to signs of hypoglycemia and hyperglycemia due to the lack of insulin pump or continuous glucose monitor (CGM) alerts, and be able to recognize other diabetes-related emergencies. • **Additional trained staff member(s)** must be available to assume these responsibilities whenever the primary delegated personnel is unavailable due to breaks, meetings, illness, or other temporary absences, ensuring uninterrupted supervision at all times." (emphasis in the original).

24. The recommendations by Dr. Sanchez were memorialized in letters sent to the school dated July 27, 2026, and October 17, 2026.

25. In March and April 2026, the family began to reach out to the home zoned school, Grady Elementary, in anticipation of C.G. attending kindergarten in August 2026.

26. On May 22, 2026, the family emailed the counselor at Grady Elementary school asking for a 504 plan. There was no response from the school.

27. On May 27, 2026, the family provided the school counselor with a proposed 504 plan and a diabetes plan in hopes that it would speed up the process of securing a 504 plan for C.G. before the start of the 2026-2027 school year. The school counselor responded this time, stating that she would get back to the family as soon as she could.

28. On May 28, 2026, the school responded that C.G. did not qualify for a 504 plan and that the school would need to do its own evaluations once school started to determine if C.G. would qualify for a 504 plan.

29. On this same date, the family received a call from a district nurse confirming receipt of the medical orders and medically fragile documentation required by the district.

30. On May 29, 2026, the family signed a mutual exchange for the district to speak to the treating doctor, Dr. Sanchez.

31. The family next reached out to the principal at Grady Elementary expressing concern that a 504 plan was needed before school began in August 2026.

32. The school responded by saying that a meeting could not be held over the summer and would have to wait until school began again.

33. After hiring an advocate and spending the summer requesting meetings, a

meeting was finally scheduled for August 5, 2026, during the pre planning week before school began.

34. A 504 plan however was not drafted, instead the district and school said that she did not qualify for a 504 plan and that an "evaluation" was needed first. The evaluation and data collection would last a minimum of 6-8 weeks. It was however agreed that C.G. could start school and that the staff at Grady Elementary would provide support at school by staff who were trained. It was also agreed that C.G.'s blood sugar checks would be communicated via cell phone (an iPhone - medical device – that traveled with the student) through text to her parents throughout the day and a daily log of those numbers would be send home at the end of the school day. The morning number would be shared with the school each morning so the school would know if she was starting the school day high, low or within range.

35. Upon information and belief, some training occurred during the preplanning week.

36. C.G. began school with her cohort on August 10, 2026.

37. C.G. has been out of school since September 25, 2026.

38. To date, C.G. has no 504 plan.

39. On August 10, 2026, C.G. arrived at school for her first day of kindergarten. All diabetic supplies and approved diabetic snack options with directions were

given to Grady Elementary staff. C.G.'s classroom had a second adult, Jalisa B. (last name unknown). Upon information and belief, this was a paraprofessional assigned to the class to monitor C.G. and provide additional adult support for the class.

40. On that same date, a request for clarification of the orders was made by the school nurse (on site LPN) and updated orders were provided on that same date. However, the nurse called later that morning and requested that the family pick up C.G. early because her glucose levels were not improving even with insulin. C.G. was picked up around 12:20 pm on her first day at school.

41. On day two, August 11, 2026, the family happened to speak to Jalisa, the paraprofessional, and provided additional information to Ms. Jalisa that including how to do a proper and safe glucose blood stick on C.G. finger.

42. On day two, the school admitted that no Baqsimi (emergency diabetic recuse medicine) training had been done so if rescue medication was needed, C.G. would have to go to the nurses office. This is concerning because it puts her at risk if she is required to move and because it necessarily means she needs to wait for emergency recuse medicine to be administered.

43. That same day, the parents were again called with questions about the orders. They were misinformed about a district policy, but again the family updated the orders as requested.

44. On that same date, the family was called again with questions about her glucose levels. It turned out that C.G. was given carbohydrates in error.

45. After new orders were provided, the school

46. Parents also requested that the text messages and daily log agreed to at the August 5 meeting be started. The log came home on August 11 and reflected six (6) glucose excursions. A glucose excursion indicates the rise and fall of blood glucose levels after meals. High or prolonged glucose excursions can lead to complications in diabetes management and are linked to cardiovascular risks.

47. On August 12, the family was called again and told the C.G. had been in the clinic for over 45 minutes and that her sugars were too high. The log also reported seven (7) glucose excursions.

48. August 13 reflected two (2) glucose excursions and August 14 showed six (6) glucose excursions.

49. August 17, 2026, the family received a call from the nurse reporting a high and out of range number. The family suggested that C.G. be given fluids. Four (4) excursions were reported on her daily log. On August 18, four (4) excursions were reported.

50. On August 18, the parents were given a consent to sign for a "504 evaluation".

51. August 19, 2026, C.G.'s glucose fell dangerously low. The school did not follow the orders and the family was required to pick C.G. up early from school due to this mismanagement. The family feared for her safety and wellbeing. In addition, four glucose excursions were reported on that same date.

52. On August 19, 2026, there was a mistake related to the carb count because C.G. had not eaten her entire lunch. She was given too much insulin.

53. August 20, 2026 there were six glucose excursions reported, August 21, there were four and on August 24, there was one.

54. On August 26, 2026, C.G.'s sugars were dangerously low. The school again did not follow the orders and gave her the wrong interventions.

55. August 28, 2026, C.G.'s sugars were again dangerously low. She was walked to the office instead of being allowed to sit down as ordered. She also had seven glucose excursions reported that day.

56. August 31, 2026, the student had to be picked up early because the school did not properly manage a high glucose incident. In addition, five glucose excursions were reported that day.

57. On September 1, 2026, C.G.'s sugars fell dangerously low. She was again walked to the office rather than being able sit as required. In addition three excursions were also reported.

58. On September 10, 2026, the parents were informed that Ms. Jalisa job was changing. On that same date, C.G.'s sugars were too high, and she was in the office for most of the day. The parents were asked to pick her up early but were unable to get there.

59. Since Ms. Jalisa's job changed, things got worse for C.G. and more mistakes were made.

60. On September 14, 2026, no glucose updates via text were provided to the family that day. It was however reported that her blood sugars were dangerously low.

61. On September 17, 2026, the family was called to give C.G. additional long-acting insulin because her blood sugars were running too high. Her grandparents waited 30 minutes but no one called the classroom teacher to bring C.G. to the office to get the additional dose of insulin as a correction. C.G. also had four glucose excursions reported that date.

62. On September 18, 2026, the blood glucose was checked early and was low but within range. By the time C.G. made it to the car, her sugar had dropped into the dangerously low level. The classroom teacher expressed that she was doing her best to follow the orders.

63. Due to the fluctuation in the student's glucose levels, it was recommended that more frequent checks be done if her numbers were too low or too high.

New orders were issued on September 18, that stated, should her blood glucose should go below 99 or above 225, she should be checked every 15 minutes until her numbers go back to within the normal range.

64. On September 21, C.G.'s numbers were again dangerously low. No communication or entry in daily diabetes log showed the use of any fast-acting sugar as required by the medical orders.

65. On September 22, no logs were provided.

66. On September 23, 2026, no information was being communicated with the family via text, so that family called for an update. It turns out the C.G. was in the nurses' office with a dangerously low blood sugar reading. The wrong intervention was given. C.G. was given honey instead of a long acting carbohydrate. Medical orders were not being followed.

67. On September 24, 2026, another mistake was made when C.G. was given a fast-acting insulin.

68. On September 25, 2026, C.G.'s numbers were dangerously low. A text was sent to the family asking what intervention should be given. No rechecks were done, but C.G. was walked to the nurses' office where more sugar was given. This was another mistake. No long acting glucose carb was ever given. The parents picked up C.G. early, fearing for her safety and wellbeing.

69. The parents reached out to the school administration and the district nursing

staff concerned about the failures to follow the doctor's orders and C.G.'s safety at school.

70. The parents again asked for a 504 plan and meeting to draft the same.

71. A meeting was finally scheduled for October 15, 2026. At the meeting, the district stated, for the first time, that the orders needed to be made clearer. The district would provide handwritten notes to the family so that the family could have those notes turned into new, more clear, orders. No 504 plan was reviewed or written on that date. Instead, the district made it clear that it did not agree with the doctor's order for one to one trained support.

72. The handwritten notes were provided late Friday afternoon and the family was able to get new orders signed, Saturday, October 17, 2026, that were in compliance with the district's request for more detail and clarification. Those new orders were shared with the district. The doctor also reiterated his order to have one to one trained support with C.G. so she could attend school safely.

73. The district was not in agreement with these new orders and stated that they needed to speak to the doctor before a 504 plan could be completed. They stated that they needed to ask some clarifying questions. Since that had not yet happened, the meeting scheduled for October 19, 2026, would not end with a completed 504 plan.

74. The meeting was cancelled until such time as the district could speak to the

doctor.

75. There was an agreement that the district and the family would speak to the doctor together so that everyone heard the same information at the same and there would be no confusion moving forward. This did not happen.

76. Rather than speak to the doctor, the district first spoke to a nurse within the office and upon information and belief expressed to this nurse that the district was not in agreement with the orders and that the doctor should change them.

77. On October 21, 2026, upon information and belief, the district spoke to the doctor and asked the doctor to change his orders because there was no money in the budget for one to one support. The district also stated that the family was demanding a one to one nurse and blood pricks every 15 minutes, neither of which are accurate. Upon information and belief, the district is putting pressure on the doctor to change his orders to reflect what the district wants, rather than what this child needs to be safe at school.

78. Although there was a learning curve at the start of the school year, when Ms. Julisa, the one to one support, was in place, communication was happening and the family felt that C.G. was safe at school.

79. Once she was removed from that role, C.G. was not safe at school. Too many life threatening mistakes were being made.

80. Rather than return the one to one support, the district has used its great

influence and power to change this student's medical orders to reflect what the district wants rather than what this student needs

81. The district has no valid reason not to follow the doctor's order and there is no valid reason this student does not yet have a 504 plan.

82. The district has placed unnecessary hoops in place to deny the implementation of the doctor's orders and delay the creation of a 504 plan.

83. A one to one trained support person is a reasonable accommodation under the ADA and Section 504 of the Rehabilitation Act. It is neither a fundamental alternative of the program nor a undue financial burden on the district. When the one to one was in place, this student was able to attend school safely. Now that the support has been removed, she is unsafe at school.

84. As a direct result of the district' actions and inactions, the student is missing school.

85. C.G.'s absences are not only causing academic harm but if it continues any longer, it could have long term negative effects on this student academically, emotionally and socially.

86. The failure of the school and district to have staff trained, failure to have a plan that addresses the student's individual needs, failure to have a one to one support person as ordered, and the failure to work with the family has placed C.G. in danger.

87. The school and the district have been deliberately indifferent to the safety of this child and the rights of the parents to be involved in the planning for their child's education.

88. T.G. and B.G. have engaged the law firm of Langer Law, P.A. to represent them and C.G. in this matter and are obligated to pay a reasonable fee for their services.

**COUNT I**
**VIOLATION OF TITLE II OF THE AMERICAN DISABILITIES ACT**
**42 U.S.C. § 12131, *et seq.***

89. T.G., B.G. and C.G. repeat and reallege the allegations in paragraphs 1 through 88 of the Complaint as if fully set forth herein.

90. Plaintiffs further allege that the actions of the Defendants are discriminatory.

91. The Defendants are recipients of federal financial assistance and are therefore subject to Title II of the ADA.

92. C.G. has a disability that substantially limits her daily life activities.

93. The ADA provides a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1)&(2).

94. The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.'

95. C.G.'s parents made reasonable requests to protect C.G. while at school, have plans in place and also made a reasonable request to have staff trained to monitor her diabetes at while at school along with a request to follow the doctor's orders to have one to one support throughout the day. These requests have been delayed and denied.

96. The actions of refusing to follow the doctor's orders, accommodate the student and instead require C.G. to be taken to the nurse instead of remaining in the classroom has been done with deliberate indifference to the impact that this movement and removal would have on C.G.

97. The parents were also treated with hostility and a lack of transparency.

98. The district is excluding and/or discriminating against C.G. solely on the basis of her disability. As a result of the district's actions and inaction, C.G. will continue to suffer and the risk of death remains at an unacceptable high level.

99. As such, the Plaintiffs are entitled to damages for the injuries as a result of these discriminatory action.

100. C.G. has no adequate or speedy remedy at law for the district's conduct described above. Because Defendant's discriminatory conduct is ongoing,

declaratory and injunctive relief against the Defendant is appropriate pursuant to 42 U.S.C. section 12133.

101. Plaintiffs are also entitled to recover reasonable attorneys' fees and costs incurred in bringing this action pursuant to 42 U.S.C. section 12205.

**WHEREFORE**, T.G., and B.G., individually and on behalf of C.G., respectfully request this Court to declare the actions of the Defendants violate the Americans with Disabilities Act, issue a permanent injunction enjoining the Defendant from discriminating against students with disabilities, require the Defendant to create a safety plan and 504 accommodation plan that is individualized for C.G. and which includes the doctor's recommendations/orders and the parents' input; and award Plaintiffs' attorneys' fees, costs and expenses incurred in this matter and for such further relief as the court deems just and equitable.

## COUNT II

## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 (29 U.S.C. § 794)

102. T.G., B.G. and C.G. repeat and reallege the allegations in paragraphs 1 through 88 of the Complaint as if fully set forth herein.

103. The District has and is currently providing educational services to the general public and is receiving federal financial assistance and is therefore, a covered entity within the meaning of the Rehabilitation Act.

104. C.G. has a disability that substantially limits her daily life activities.

105. C.G.'s parents asked for an individualized safety plan/504 accommodation plan be developed to ensure the student's safety on the school campus and for staff to be trained to monitor the student's diabetes along with a request to follow the doctor's order for one to one trained support. These requests were delayed, thus denied and denied.

106. The district has failed to provide C.G. with reasonable accommodations by initially denying a 504 plan and continue to deny a plan. The district further discriminated against C.G. by not implementing the doctor's orders as written endangering C.G. while at school.

107. The district is discriminating against C.G. solely on the basis of disability.

108. As a result of the district's action and inaction, the Plaintiffs have suffered and will continue to suffer extreme hardship and actual and impending irreparable harm and risk of death.

109. C.G. has no adequate or speedy remedy at law for the district's conduct described above. Because Defendant's discriminatory conduct is ongoing, declaratory and injunctive relief against the Defendant is appropriate pursuant to 42 U.S.C. section 12133.

110. Plaintiffs are also entitled to recover reasonable attorneys' fees and costs incurred in bringing this action.

111. Defendant's policies, practices and procedures, particularly the actions and omissions described above, violated the Plaintiffs rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

112. The Defendant has acted either intentionally or in deliberate disregard for the protected rights of the plaintiffs herein.

113. As a proximate result of the foregoing, Plaintiffs have actual damages.

**WHEREFORE**, T.G. and B.G. individually and on behalf of C.G., respectfully pray that this Court grant the following relief against the District, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendant's practices, policies and procedures have subjected Plaintiffs to discrimination in violation of Section 504 of the Rehabilitation Act permanently enjoining Defendant from any practice, policy and/or procedure which will deny Plaintiff equal access to and benefit from Defendant's services, award compensatory damages, reasonable costs and attorneys' fees and any other relief this court deems necessary and appropriate.

## COUNT III
## RETALIATION

114. T.G., B.G. and C.G. repeat and reallege the allegations in paragraphs 1 through 88 of the Complaint as if fully set forth herein.

115. Retaliation is prohibited under the ADA. 42 U.S. Code § 12203.

116. The definition of retaliation is found in the implementing regulations of the Americans with Disabilities Act at 28 CFR 36.206.

117. Plaintiffs allege that the district is delaying thus denying the request for a 504 plan and refusing to follow the doctor's orders in retaliation for the continued strong efforts to advocate for C.G. to be safe at school.

118. The decision to ignore the doctor's orders and delay – thus deny – a 504 plan were done without justification.

119. A prima facie case for retaliation consists of four elements: "1) the plaintiff engaged in legally protected activity; 2) the defendant knew about the plaintiff's exercise of this right; 3) the defendant then took an action adverse to the plaintiff; and 4) the protected activity and the adverse action are causally connected."

120. In this case, advocating for C.G. is protected action including asking for a 504 plan and for the school to follow the doctor's orders.

121. In response to this advocacy, the district and delayed and denied a 504 plan and refused to follow the doctor's order making it unsafe for C.G. to be at school. As a direct result of these actions, C.G. is missing school.

122. The district has been deliberately indifferent to the needs of this student and the impact this retaliation has had on C.G. and her family.

123. The plaintiff C.G. has missed school and has missed time in the classroom.

124. This retaliation has caused C.G. confusion, frustration, distress and embarrassment due to defendant's retaliatory acts.

**WHEREFORE**, T.G. and B.G. individually and on behalf of C.G., demand judgment against the Defendant for damages, together with their attorney's fees and costs, and such further relief as the court deems just and equitable.

**JURY DEMAND**

A TRIAL BY JURY IS DEMANDED FOR ALL ISSUES TRIABLE AS OF RIGHT BY A JURY.

Respectfully submitted this 22nd day of October, 2025.

By: s/_ *Stephanie Langer* _____
Stephanie Langer, Esq.
Florida Bar No. 149720
LANGER LAW, P.A.
450 State Road 13 North
Suite 106 - Box 162
St. Johns, Florida 32259
Phone (305) 570-0940
Facsimile (305) 204-9602
slanger@langerlawpa.com
admin@langerlawpa.com